﻿Citation Nr: AXXXXXXXX
Decision Date: 10/30/19 Archive Date: 10/30/19

DOCKET NO. 190125-1608
DATE: October 30, 2019

ORDER

Entitlement to service connection for coronary artery disease, status post myocardial infarction with bypass graft is denied.

FINDINGS OF FACT

1. The Veteran has a current diagnosis of coronary artery disease.

2. The evidence does not demonstrate that the Veteran had actual herbicide agent exposure during active service nor that he served in a location during an applicable time period for which herbicide agent exposure may be presumed or in such areas and circumstances for which Veterans Affairs (VA) has otherwise acknowledged herbicide agent use and established special consideration. 

3. Coronary artery disease was not manifest during or within one year of service; and, the preponderance of the evidence fails to establish that a present disability is etiologically related to service, including as a result of herbicide agent exposure. 

CONCLUSION OF LAW

The criteria for service connection for coronary artery disease, status post myocardial infarction with bypass graft, to include as a result of herbicide agent exposure, have not been met. 38 U.S.C. §§ 1101, 1110, 1112, 1113, 1116, 1154(a); 38 C.F.R. §§ 3.303, 3.307, 3.309. 

REASONS AND BASES FOR FINDINGS AND CONCLUSION

The Board notes that the rating decision on appeal was issued in August 2017. In August 2018, the Veteran elected the modernized review system. 84 Fed. Reg. 138, 177 (Jan. 18, 2019) (to be codified at 38 C.F.R. § 19.2(d)).

The Veteran served on active duty from August 1970 to August 1973; August 1973 to August 1977; and May 2010 to August 2010. The Veteran selected the Higher-Level Review lane when he opted in to the Appeals Modernization Act (AMA) review system by submitting a Rapid Appeals Modernization Program (RAMP) election form. Accordingly, the January 2019 AMA rating decision considered the evidence of record as of the date VA received the RAMP election form. The Veteran timely appealed this rating decision to the Board and submitted a supplemental claim via the evidence lane in January 2019. 

The VA Regional office (RO) made a favorable finding on behalf of the Veteran, for a current diagnosis of coronary artery bypass graft with acute myocardial infarction. See January 2019 Rating Decision. 

SERVICE CONNECTION

Service connection may be granted for a disability resulting from disease or injury incurred in or aggravated by active service. 38 U.S.C. § 1110. Generally, the evidence must show: (1) the existence of a present disability; (2) in-service incurrence or aggravation of a disease or injury; and (3) a causal relationship between the present disability and the disease or injury incurred or aggravated during service. Shedden v. Principi, 381 F.3d 1163, 1166-67 (Fed. Cir. 2004).

Certain chronic diseases, such as coronary artery disease, are subject to presumptive service connection if manifest to a compensable degree within one year from separation from service even though there is no evidence of such disease during the period of service. This presumption is rebuttable by affirmative evidence to the contrary. 38 U.S.C. §§ 1112, 1113; 38 C.F.R. §§ 3.307(a)(3), 3.309(a). Under 38 C.F.R. § 3.303(b), an alternative method of establishing the second and third Shedden elements is through a demonstration of continuity of symptomatology if the disability claimed qualifies as a chronic disease listed in 38 C.F.R. § 3.309(a). Walker v. Shinseki, 708 F.3d 1331 (Fed. Cir. 2013).

Certain disorders, including coronary artery disease, if manifest to a degree of 10 percent or more for an herbicide agent-exposed veteran may be presumed service connected. 38 U.S.C. § 1116; 38 C.F.R. §§ 3.307, 3.309(e). The term “herbicide agent” means a chemical in an herbicide used in support of the United States and allied military operations in the Republic of Vietnam during the period beginning on January 9, 1962, and ending on May 7, 1975, specifically: 2,4-D; 2,4,5-T and its contaminant TCDD; cacodylic acid; and picloram. 38 C.F.R. § 3.307(a)(6)(i). Generally, veterans diagnosed with an enumerated disease who served in the Republic of Vietnam, near the Korean demilitarized zone (DMZ) in areas where herbicides were known to have been applied, or who regularly and repeatedly operated, maintained, or served onboard C-123 aircraft known to have been used to spray an herbicide agent during the Vietnam era shall be presumed to have been exposed to an herbicide agent. 38 C.F.R. § 3.307(a)(6).

VA has acknowledged herbicide agent use in Thailand and has established special consideration and procedures for claims based on herbicide agent exposure in those locations. A veteran may submit the dates, location and nature of the alleged exposure, which will be referred to the Joint Services Records Research Center (JSRRC) for a formal finding concerning herbicide agent exposure.

The Veterans Benefits Administration (VBA), Compensation & Pension (C&P) Service issued a “Memorandum for the Record” on herbicide use in Thailand during the Vietnam Era. The Department of Defense (DoD) reported that only limited testing of tactical herbicides was conducted in Thailand from April 2, 1964, to September 8, 1964, and specifically identified that location as the Pranburi Military Reservation. The Memorandum noted that tactical herbicides, such as Agent Orange, were used and stored in Vietnam, not Thailand. A letter from the Department of the Air Force indicated that, other than the 1964 tests on the Pranburi Military Reservation, there were no records of tactical herbicide storage or use in Thailand. However, there were records indicating that commercial herbicides were frequently used for vegetation control within the perimeters of air bases during the Vietnam era, but all such use required approval of both the Armed Forces Pest Control Board and the Base Civil Engineer (BCE). 

The Memorandum advised that if the Veteran’s claim was based on servicing or working on aircraft that flew bombing missions over Vietnam, that there was no presumption of “secondary exposure” based on being near or working on aircraft that flew over Vietnam or handling equipment once used in Vietnam, as aerial spraying of tactical herbicides in Vietnam did not occur everywhere and it would be inaccurate to find that herbicides covered every aircraft and piece of equipment associated with Vietnam. Additionally, the Memorandum noted that the high-altitude jet aircraft stationed in Thailand generally flew far above the low and slow flying UC-123 aircraft that sprayed tactical herbicides over Vietnam during Operation RANCH HAND, and that were no studies showing harmful health effects for any such secondary or remote herbicide contact that may have occurred. The Memorandum states that unless the Veteran’s assertion is inherently incredible, clearly lacks merit, or there is no reasonable possibility that further VA assistance would substantiate the claim, a request should be made to the JSRRC to attempt to corroborate the Veteran’s assertion. 

VA’s C&P Service has further issued information concerning the use of herbicide agents in Thailand during the Vietnam era. In a May 2010 bulletin, the Compensation Service indicated that it had determined that there was significant use of herbicides on the fenced-in perimeters of military bases in Thailand intended to eliminate vegetation and ground cover for base security purposes. A source for this information was the declassified Vietnam era DoD document titled “Project CHECO Southeast Asia Report: Base Defense in Thailand.” Although DoD indicated that the herbicide use was commercial in nature rather than tactical, the C&P Service determined that there was some evidence that herbicides of a tactical nature, or that of a “greater strength” commercial variant with characteristics of tactical herbicides, were used. Therefore, if a veteran served in the U.S. Air Force in Thailand during the Vietnam era between February 28, 1961 and May 7, 1975, at U-Tapao, Ubon, Nakhon Phanom, Udorn, Takhli, Korat or Don Muang Royal Thai Air Force Base (RTAFB) as an Air Force security policeman, security patrol dog handler, member of a security police squadron, or otherwise served near the air base perimeter, as shown by their military occupational specialty (MOS), performance evaluations, or other credible evidence, herbicide agent exposure should be conceded on a facts-found or direct basis. The C&P Service determined that special consideration of herbicide exposure on a facts-found or direct basis should be extended to those Veterans, allowing for presumptive service connection of the diseases associated with herbicide exposure. 

It is the policy of VA to administer the law under a broad interpretation, consistent with the facts in each case, with all reasonable doubt to be resolved in favor of the claimant. 38 C.F.R. § 3.102.

Entitlement to service connection for coronary artery disease, status post myocardial infarction with bypass graft. 

The Veteran asserts that he was exposed to herbicide agents in Da Nang, Vietnam and at the Royal Thai Air Force Base (RTAFB) in U-Tapao, Thailand, during service from December 1972 to May 1975. 

The question in this case is whether the Veteran had exposure to herbicide agents in service and whether a causal relationship or nexus exists between his coronary artery disease and his active service.

A review of the Veteran’s military personnel records shows multiple temporary duty deployments to U-Tapao RTAFB. See October 2017 Military Personnel Record. 

The Veterans DD Form 214 however, does not indicate that he served in Vietnam, but rather Indochina. He received awards including the Vietnam Service Medal and the Republic of Vietnam Campaign Medal. His MOS is reported as aircraft maintenance specialist and does not indicate that he served near the air base perimeter. 

In statements provided in support of his claims, the Veteran reported that he served as an in-flight mechanic while flying on drone launch missions. The mission was to fly to North Vietnam, launch drones, and then fly to Da Nang, Vietnam, to wait for the drones to be recovered and return to U-Tapao RTAFB. According to the Veteran, because there were only two aircrafts assigned to this mission and a handful of mechanics, maintenance personnel (himself included) were utilized in the recovery and transportation of the drones from Da Nang. His tours of duty were from December 1972 to April 1973; June 1973 to August 1973; December 1973 to March 1974; December 1974 to May 1974; and January 1975 to May 1975. See October 2017 and also October 2017 Statement in Support of Claim. 

The Board reviewed the competent buddy statement offered by C.B.S. in which he provides a detailed explanation for the Buffalo Hunter mission. According to his dates of service for this mission, May 1974 to July 1976, C.B.S. would have crossed paths with the Veteran during the Veteran’s temporary duty to U-Tapao RTAFB, between January 1975 to May 1975. However, C.B.S. indicates that he does not recall the Veteran personally which does not lend credibility to the Veteran’s assertion. 

The Board reviewed the email from B.J. recalling his visit to Da Nang, however he does not indicate that he and the Veteran served in Vietnam or that he knew the Veteran while in Vietnam, but only that he was in Da Nang and spent the night. Although this evidence is competent, the Board does not find it credible. See January 2011 Email Correspondence. 

The RO performed development regarding the Veteran’s assertion of herbicide exposure in Vietnam and issued a formal finding of no Agent Orange exposure in Vietnam. See May 2011 VA Memo and July 2013 DPRIS. 

The Board finds that the weight of the competent and credible evidence is against a finding that the Veteran had actual exposure to herbicide agents in Vietnam. 

The Veteran is competent to establish facts that can be observed by the use of a person’s five senses. Layno v. Brown, 6 Vet. App. 465, 469 (1994). As such, he is competent to report the events that occurred in service, including the locations of such service and his duties during service. However, in rendering a decision on appeal, the Board must analyze the credibility and probative value of the evidence, account for the evidence which it finds to be persuasive or unpersuasive and provide the reasons for its rejection of any material evidence favorable to the claimant. Gabrielson v. Brown, 7 Vet. App. 36, 39-40 (1994); Gilbert v. Derwinski, 1 Vet. App. 49, 57 (1990).

The Veteran’s MOS does not fall under the VA’s C&P Service’s enumerated list of duties that would place him near the base perimeters of U-Tapao RTAFB. The Veteran however contends that his duties as a mechanic did place him in the perimeters. According to his lay statements, the Veteran did not have a fixed maintenance facility, and all maintenance activities took place on the north end of the flight line, near the north end of the taxiway and runway. He further contends that it was not unusual for him to go to the north end of the runway to repair aircraft that could not taxi to the tarmac due to trouble with landing gears and tires, and that those types of repairs had to be completed before the aircraft could be moved. The Veteran also explains how he had to take aircrafts to an airway between the taxiway and runway at the north end of the base to calibrate the compass and on-board navigation computer. This process, he explains would take up to twelve hours and required him to travel along the perimeter road to reach the location of the aircraft. The Veteran also asserts that he often traveled along the perimeter road to dine in the flight line kitchen, located on the northeast side of the runway. Additionally, he indicates that he lived in open-air barracks near the north end of the flight line which was located close to the perimeter. See October 2017 Statement in Support of Claim.

As a mechanic, J.E.M., another veteran, provided a buddy statement on behalf of the Veteran as they served both served together in U-Tapao RTAFB. According to J.E.M., they were responsible for all DC-130 aircraft and their tasks included but was not limited to: refueling, pre and post inspection, and aircraft repairs. He explained that these maintenance tasks were performed in the parking area closer to the end of the flight line as that is where their assigned aircraft was primarily located. J.E.M. also stated that it was not uncommon for them to be “close to, if not at the outer base perimeter” to perform their daily maintenance tasks. He further indicated that when not walking or riding their assigned unit shuttle, their other mode of transportation was the base-operated bus, which drove along the base perimeter roads. See June 2013 Buddy Statement.

R.L.J. also provided a buddy statement in support of the Veteran’s claim. R.L.J., who served in drone maintenance, provided details on the Veteran’s possible exposure to herbicide based on his experience. R.L.J. alleges that the following places were sprayed with a deadly pesticide: the work shed for drone maintenance which was located next to the flight line, the outdoor theater, area for engine runs which would have placed he and the Veteran inside the perimeter fence area, the main entrance gate, and the beach club. See June 2013 Buddy Statement.

The Board reviewed R.L.J.’s photographs offered in support of his buddy statement however, he does not provide official documents to support his claim of herbicides being used in the stated areas of the base. Further, R.L.J.’s statement while well-intentioned, does not credibly support the Veteran’s actual exposure to herbicides. R.L.J. clearly states that he does not remember meeting the Veteran while stationed at U-Tapao RTAFB, despite arriving in June 1973, the same month as the Veteran’s new temporary duty.

The Board also considered the competent buddy statement of T.C.J. however, he did not serve at U-Tapao RTAFB during the Veteran’s service period. In his statement, T.C.J. detailed locations that the Veteran may have visited as part of his job duty such as the north access road. He also noted the significant difference between the limited vegetation inside the base to the lush vegetation immediately off base which he believes is due to herbicide treatment. See October 2017 Affidavit. 

The Board factored in W.E.T.’s competent buddy statement and the photographs he provided in support of the Veteran’s assertion of herbicide exposure. W.E.T.’s period of service at U-Tapao RTAFB, was from April 1972 to April 1973 and again in January 1975. Though he does not explicitly indicate that he knew the Veteran during these two periods, he was assigned to the DC-130 aircraft. The photographs he took display various angles of U-Tapao RTAFB. See March 2019 Affidavit and August 2019 Photographs. 

The Veteran’s statements regarding exposure to herbicides along the perimeter at U-Tapao RTAFB are inconsistent with the other credible evidence of record. Such statements are in conflict with the official service treatment and personnel records which fail to demonstrate that the type of duties that the Veteran performed as a maintenance specialist placed him along the perimeter of the base. Further, there is no historical information to document the spraying of Agent Orange or tactical herbicide spraying, testing or storage at U-Tapao RTAFB during his time in service. See July 2013 DPRIS.

The broad and liberal application of the VA’s Thailand herbicide policy that the Veteran is asking the Board to afford him, is not in line with the spirit for which the policy was created. VA’s policy which requires evidence of proof near the perimeter was created to distinguish those veterans who were actually exposed to herbicide agents from those who happened to serve on the base and whose exposure was unlikely or improbable. If the VA’s research concluded that everyone stationed at U-Tapao RTAFB was exposed in some way or another, its policy would reflect as much. It does not. As discussed above, the Board finds that the Veteran’s duties did not put him near the perimeter of the base. 

The Board does not find the Veteran’s accounts of herbicide exposure credible. Therefore, the evidence of record does not establish that the Veteran was exposed to tactical or commercial herbicides while stationed in Thailand and, thus he is not entitled to any presumption that would result from such exposure. 

A medical note from April 1975 indicates that the Veteran suffered from chest pain on his left side and that he was hit by a door like object. There is no contemporaneous record mentioning any cardiac diagnosis or symptoms. See September 2013 Service Treatment Record. 

Private medical records show the Veteran received a diagnosis of coronary artery disease and underwent a coronary artery bypass grafting in November 2007. Subsequent reports included diagnosis of coronary artery disease without additional opinion as to etiology. See July 2009 Medical Treatment Record Non-Governmental Facility. 

Based upon a comprehensive review of the record, the Board finds that the evidence does not demonstrate that the Veteran had actual herbicide agent exposure during active service nor that he served in a location during an applicable time period for which herbicide exposure may be presumed or in such areas and circumstances for which VA has otherwise acknowledged herbicide use and established special consideration. 

The Board further finds that coronary artery disease was not shown to have been manifest during service or within a year of discharge. The preponderance of the evidence also fails to establish that present coronary artery disease is etiologically related to service. The medical evidence demonstrates that a diagnosis of coronary artery disease was first provided in November 2007, many years after service. The diagnosis and dates of onset are not in dispute. 

Consideration has been given to the Veteran’s personal assertion that he has present coronary artery disease related to service, including as a result of Agent Orange exposure. However, while lay persons are competent to provide opinions on some medical issues, see Kahana v. Shinseki, 24 Vet. App. 428, 435 (2011), the specific issues in this case fall outside the realm of common knowledge of a lay person. Jandreau v. Nicholson, 492 F.3d 1372, 1377 n.4 (Fed. Cir. 2007). The disability at issue is not a condition that is readily amenable to lay diagnosis or probative comment regarding etiology. Davidson v. Shinseki, 581 F.3d 1313 (Fed. Cir. 2009); Woehlaert v. Nicholson, 21 Vet. App. 456, 462 (2007). Nothing in the record demonstrates the Veteran received any special training or acquired any medical expertise. King v. Shineski, 700 F.3d 1339, 1345 (Fed. Cir. 2012). Accordingly, the lay evidence does not constitute competent medical evidence and lacks probative value. 

(Continued on the next page)

 

The Board is aware of previous decisions granting service connection under the presumption of herbicide exposure and takes note of the citations provided by the Veteran’s attorney. As each case is unique and the facts along with evidence available for decision-making varies, the Board cannot base its decision to grant or deny a claim on said citations but can take them under advisement. 

In conclusion, the Board finds that service connection for coronary artery disease, status post myocardial infarction with bypass graft is not warranted. When all the evidence is assembled, VA is then responsible for determining whether the evidence supports the claim or is in relative equipoise, with the claimant prevailing in either event, or whether a preponderance of the evidence is against the claim in which case the claim is denied. Gilbert v. Derwinski, 1 Vet. App. 49, 55 (1990); Ortiz v. Principi, 274 F.3d 1361 (Fed. Cir. 2001). The preponderance of the evidence is against the Veteran’s claim.

 

 

KELLI A. KORDICH

Veterans Law Judge

Board of Veterans’ Appeals

Attorney for the Board Junie Telamour, Associate Counsel

The Board’s decision in this case is binding only with respect to the instant matter decided. This decision is not precedential, and does not establish VA policies or interpretations of general applicability. 38 C.F.R. § 20.1303.